UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ELIASSEN GROUP LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 22-CV-11871-AK |
| ARTIFICIAL INVENTIONS LLC, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER ON MOTION FOR DEFAULT JUDGMENT**

**ANGEL KELLEY, D.J.**

Plaintiff Eliassen Group LLC ("Eliassen") is a recruiting firm with a principal place of business in Reading, Massachusetts. Eliassen alleges that Defendant Artificial Inventions LLC ("Artificial") breached the agreement to provide Eliassen's client, Nomura America Services, LLC ("the Client") with its selected data engineer to perform services. This resulted in a breach of contract, security violations, and strained the professional relationship between Eliassen—who facilitated the arrangement—and the Client. Eliassen brings five counts including, Count I and II, Breach of Contract; Count III, Tortious Interference with Advantageous Contractual Relationship; Count IV, Unfair and Deceptive Trade Practices; and Count V, Respondeat Superior. [Dkt. 1]. On March 16, 2023, Eliassen moved for and was granted an entry of default after Artificial failed to respond to the Complaint. [Dkt. 12]. Eliassen now moves for default judgment. [See Dkts. 12-15; 18-20]. For the following reasons, the Motion for Default Judgment [Dkt. 18] is **GRANTED**.

I. BACKGROUND

Eliassen and the Client had a decade-long relationship through business contacts, and Eliassen had worked hard to acquire business from the Client. [Dkt. 1 at ¶ 6-7].[1] Eliassen finally received an opportunity to recruit and provide the Client with workers to fill open positions for the first time in 2022.[2] There was no prior history of a relationship where Eliassen regularly supplied the Client with employees. On February 22, 2022, Eliassen and Artificial entered into a contract in which Artificial agreed to act as the "supplier" to help fill the open data engineer position for the Client. [Id. at ¶ at 11]. The supplier would employ the workers, however, the employee would provide services to the Client. [Id.]. Artificial put forth its worker, Kumar Syamala, as a candidate ("Employee") who the Client interviewed and hired. [Id. at ¶ 19]. Pursuant to the contract in April 2022, Eliassen and Artificial executed a purchase order with a maximum compensation of $166,400.00, in which Artificial agreed to provide Syamala to perform services for the Client. [Id. at ¶¶ 15-17; Dkt. 1-1 at 8]. The Client then provided Syamala, with equipment, and system and network access to perform the duties associated with his position. [Id. at ¶¶ 18, 20].

Weeks after Syamala was hired, during a virtual meeting, the Client's employees discovered that the individual who portrayed himself as Syamala was in fact an imposter. [Id. at ¶ 24]. The imposter apparently had access to the system and was performing services in the weeks leading up to the virtual meeting. [Id. at ¶ 23]. Artificial was apparently aware that Syamala had no intention of performing the services he was hired for. [Id. at ¶ 26]. The Client immediately

---

[1] Supplemented by witness testimony that clarified the business relationship between the Client and Eliassen.
[2] The Complaint alleges that Eliassen would occasionally rely on a third-party supplier, such as Artificial, to provide the Client with workers for open positions. [Dkt. 1 at ¶ 10]. This allegation was contradicted by Eliassen's witness's testimony that Eliassen provided its first (and only) worker for the Client's available position with Syamala.

terminated Syamala's position, and then hired a third party to conduct a forensic audit to determine if confidential information had been stolen, and whether the network systems were damaged. [Id. at ¶¶ 27-29]. Eliassen agreed to cover the cost of the audit, totaling $55,191.21. [Id. at ¶ 29]. The Client also threatened to suspend further business with Eliassen, which resulted in the loss of nine (9) requisitions (with an estimated revenue loss of $240,000). [Dkts. 1 at ¶ 30; 18 at ¶ 5].

Eliassen made efforts to contact Artificial with a demand letter through various means, however, Artificial was unresponsive. [Dkt. 1 at ¶ 32-33]. In August 2022, Eliassen received emails from Artificial stating that the company had been recently acquired, and that Artificial was unable to reach the Employee or the previous owners of the business. [Id. at ¶ 34-35]. After a good-faith effort to continue to engage Artificial, to no avail, Eliassen filed suit November 4, 2022. [Id. at ¶ 36; at 11]. The Complaint seeks monetary relief and attorneys' fees for breach of contract (Counts I and II), tortious interference with an advantageous contractual relationship (Count III), unfair and deceptive trade practices in violation of Massachusetts General Law Chapter 93A, Section 11 (Count IV), and respondeat superior (Count V). [Id. at 7-10]. Eliassen alleges total damages (including costs, attorneys' fees, and trebled amounts where appropriate) to be $1,893,496.89. [Dkt. 18 at 3]. After attempting, but failing to effectuate service, Eliassen (with the Court's permission) attempted service through alternate means through email, in addition to USPS Certified Mail, Federal Express, and in-person. [Dkt. 7]. Proof of service was obtained on December 2, 2022 and December 22, 2022, however, Artificial has failed to respond to the Complaint. [Dkt. 8 at 2-4]. On August 18, 2022, Eliassen finally received a response from Artificial stating that the business recently had been acquired and that it requested more time to address the matter. [Dkt. 9-3]. To date, Artificial has failed to respond to the Complaint.

In accordance with the Federal Rule of Civil Procedure 55(a), Eliassen moved for entry of default on March 16, 2023, which was entered on May 30, 2023, for Artificial's failure to respond or otherwise defend itself in this matter. [Dkts. 12-14]. On June 29, 2023, Eliassen moved for default judgment [see Dkt. 18] in accordance with the Court's standing order. [Dkt. 15].

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure provide a two-step process for default judgment. See Fed. R. Civ. P. 55. First, the clerk must enter a notation of default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). Second, upon obtaining a notation of default, the plaintiff must apply to the court for default judgment where the amount of damages is not a "sum certain." See Fed. R. Civ. P. 55(b)(2). The party that has defaulted "is deemed to have admitted all of the allegations in the complaint." CNE Direct, Inc. v. Blackberry Corp., 55 F. Supp. 3d 233, 234 (D. Mass. 2014); see SEC v. Tropikgadget FZE, 146 F. Supp. 3d 270, 275 (D. Mass. 2015) (internal quotations and citation omitted) (noting that entry of default "constitutes an admission of all facts well-pleaded in the complaint"). However, the court independently "may examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002) (citation omitted). While the court may set a hearing to determine damages "when the amount is in dispute or is not ascertainable from the pleadings," the court may order default judgment without a hearing where "the allegations in the complaint state a specific, cognizable claim for relief, and the defaulted party had fair notice of

its opportunity to object . . . ." In re The Home Rests., Inc. v. Family Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002).

### III. DISCUSSION

Eliassen has satisfied the first step of the default judgment process. [Dkts. 12-13]. The Court now evaluates whether Eliassen has sufficiently pleaded breach of contract, tortious interference, unfair and deceptive trade practices in violation of Massachusetts General Laws Chapter 93A, Section 11, and respondeat superior. For the reasons stated below, Eliassen has made a plausible showing for all claims, therefore the Court will then assess the requested damages. See In re The Home Rests., Inc., 285 F.3d at 114.

#### A. Breach of Contract

The terms of the contract between Eliassen and Artificial is governed by Massachusetts law. [Dkt. 1, Ex. A at ¶ 17]. Eliassen claims that Artificial violated the terms of the contract and failed to indemnify Eliassen for the amounts it paid to the Client, due to Artificial's breach. Eliassen further alleges that it has suffered and continues to suffer damages as a direct and proximate result of Artificial's breach of the contract. To prevail in a breach of contract claim, a plaintiff must demonstrate that "(1) an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage." Hoang v. Eternal Salon, Inc., 81 N.E.3d 822 (2017) (citing Singarella v. Bost., 173 N.E. 2d 290, 291 (1961)) (citations omitted). Plaintiffs must also establish causation by proving that "but for the defendant's breach the plaintiff would have realized some gain or avoided loss." Gemini Invs. Inc. v. AmeriPark, Inc., 643 F.3d 43, 48 (1st Cir. 2011).

Eliassen and Artificial entered into a contract on February 22, 2022 [Dkt. 1 at ¶ 11] whereby Artificial, as the Supplier, agreed to provide Syamala to work for the Client. [Dkt. 1-1 at 8]. Artificial's failure to do so breached the February 22 agreement with regard to the Scope and Representation clauses—the requirement for the Artificial to provide accurate qualifications and information regarding the Employee it offers up, specified in the Purchase Order (Exhibit A). [Dkt. 1-1 at 2, 3, ¶ 4(a); Ex. A at ¶ 8]. Artificial also violated the agreement's indemnification clause when it failed to compensate Eliassen for the damages resulting from the breach (for example, the cost of the security audit). [See Dkt. 1 at ¶¶ 43-44] (requiring the Supplier to compensate Eliassen and/or the Client when liabilities or costs are incurred as a consequence of Supplier's breach). It is plausible that these breaches directly caused monetary damages suffered by Eliassen, especially the costs related to the security audit.

### B. Tortious Interference

Eliassen claims that Artificial "intentionally interfered with [its] advantageous contractual relationship with the Client." [Dkt. 1 at 8]. Under Massachusetts law, tortious interference with a contract or business relationship requires:

> 1) he had a contract [or business relationship] with a third party, 2) the … defendant knowingly induced the third party to break that contract [or business relationship], 3) th[at] interference, in addition to being intentional, was improper in motive or means and 4) the [plaintiff] was harmed by the … defendant's actions.

Sensitech Inc. v. LimeStone FZE, 548 F. Supp. 3d 244, 258 (D. Mass. 2021) (quoting Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 536 (2011)). Notably, "[a] party cannot 'tortiously interfere' with a contract or business relationship to which he is a party." Id. "[I]mproper conduct, beyond the interference itself, is 'an element both in the proof of intentional interference with performance of a contract . . . and in the proof of intentional interference with a prospective

contractual relationship.'" Cavicchi v. Koski, 855 N.E.2d 1137, 1141 (2006) (quoting Hunneman Real Estate Corp. v. Norwood Realty, Inc., 427, 765 N.E.2d 800, 808 (2002)).

Eliassen's has pled sufficient facts for a viable intentional interference of a contractual claim. The only contract at issue here concerning interference, is the contract between Eliassen and the Client regarding Syamala's services. Artificial (and its employee, Syamala) knew of the contract and its requirements; Artificial, through the actions of its employee, and its knowledge of its employee's deliberate breach of his duties, intentionally interfered with contract between Eliassen and the Client; and did so through improper means, in what appears to be a deceptive effort to swap out employees once a qualified employee was hired. As a result of the interference, Eliassen forfeited the compensation promised by the contract, as well as the cost for the audit. As for prospective harm of business Eliassen hoped for, no other existing contracts were alleged, failing to meet the first requirement for a contractual tortious interference claim. See Sensitech Inc., 548 F. Supp. 3d at 258 (there must be a contract for intentional interference of a contractual claim).

To the extent Eliassen intended to address the alleged loss of prospective business through an interference with advantageous business relations claim,[3] Artificial's actions caused "the Client to *consider* suspending future business with Eliassen," which, even a generous interpretation of the facts when squarely looking within the four corners of the complaint, does not indicate the business relationship ended. [Dkt. 1 at ¶ 47]. Another portion of the Complaint states that "the Client *threatened* to stop utilizing Eliassen for a significant portion of its business," [Dkt. 1 at ¶ 30], which indicates that, while the relationship was strained, it remained intact. While the

---

[3] Eliassen titled its claim "interference with advantageous business contracts" which appears to be two claims combined into one. The standards are alike, nonetheless, at the motion to dismiss stage. See Fiorillo v. Winiker, 85 F. Supp. 3d 565, 571 (D. Mass. 2015).

termination of the relationship is not required to succeed on the interference claim, it muddles the harm. Eliassen did not have a history of filling positions for the Client, so the harm in terms of prospective business, does not surpass the low bar of speculation for several reasons, to include the failure to provide the who, what, when, and how. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation marks and citations omitted) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .")); see also Tech Plus, Inc. v. Ansel, 793 N.E.2d 1256, 1262 (2003) ("[A] plaintiff [can]not recover on a claim for tortious interference with advantageous relationships where she ha[s] failed to show that she ha[s] suffered any pecuniary loss as a result of the defendant's actions.").

### C. Unfair and Deceptive Trade Practices under M.G.L. ch. 93A, §11

Eliassen states that it engaged with Artificial in the conduct of trade or commerce, and Artificial's conduct in their working relationship was unfair, deceptive, and violated established concepts of fairness, thereby willfully and knowingly violating M.G.L. ch. 93A, §11. Eliassen further claims that as a direct and proximate result of Artificial's unfair and deceptive conduct, Eliassen suffered (and continues to suffer) economic injury.

To succeed on a claim under Chapter 93A, a plaintiff must show that: (1) the defendant engaged in trade or business and committed an unfair or deceptive practice defined by Chapter 93A, § 2; (2) this act resulted in economic injury to the plaintiff; and (3) there is a casual connection between the unfair practice and the plaintiff's economic injury. M.G.L. ch. 93A, § 9. "A mere breach of contract, without more, does not constitute a violation of Chapter 93A," and even a "mistake" or "honest dispute" fail to reach the threshold. Monotype Imaging Inc. v. Deluxe Corp., 883 F. Supp. 2d 317, 323 (D. Mass. 2012) (citing Madan v. Royal Indem. Co., 532 N.E.2d 1214, 1217 (1989)). Rather there must be "some level of bad faith" and a "level of

rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. at 322-323. Simple errors, negligent acts, and even negligent misrepresentations are not ordinarily actionable under Chapter 93A, unless they are egregious. Aquino v. Pacesetter Adjustment Co., 416 F. Supp. 2d 181, 192 (D. Mass. 2005).

To determine whether conduct is "unfair" under Chapter 93A, courts consider several factors, including "(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Hanrahran v. Specialized Loan Servicing, LLC, 54 F. Supp. 3d 149, 154 (D. Mass. 2014). While the question of unfairness (or deception) is generally considered a "factual inquiry, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." Monotype Imaging Inc., 883 F. Supp. 2d at 322–23 (citations and internal quotation marks omitted); Com. Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000). Deceptive conduct has simply been described as practices that "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." City of Beverly v. Bass River Golf Mgmt., Inc., 93 N.E.3d 852, 863 (2018) (internal quotation marks and citation omitted); Brown v. Bank of Am., Nat., Ass'n, 67 F. Supp. 3d 508, 514 (D. Mass. 2014).

It is plausible that Artificial's conduct was both deceptive and unfair, as Artificial is alleged to have known that employee Syamala had no intention of performing his duties indicated by the contract, and "allow[ed]" another employee to conduct the work instead. [See Dkt. 1 ¶¶ 25-26]. The likelihood that this was a simple mistake or a one-time incident is diminished by the allegation that Syamala never performed any services for the client, and his replacement operated

with access to a computer system meant for Syamala. [Dkt. 1 at ¶¶ 22-23]. Taken at face value, these allegations certainly rise to the "level of rascality that would raise an eyebrow" by using one employee to procure a hired position, but then allowing another employee to do the actual work. Monotype Imaging Inc., 883 F. Supp. 2d at 322. With regard to deceptiveness, it is also plausible that Eliassen (or the Client) would have acted differently (severed the contract, interviewed another candidate, or at the least, declined to provide the mystery employee network access), had they been aware that Artificial would not provide Syamala as agreed upon.

As for the last prong, Chapter 93A allows for "economic or noneconomic" injuries. Geis v. Nestle Waters N. Am., Inc., 321 F. Supp. 3d 230, 242 (D. Mass. 2018). An economic injury requires a showing of "real economic damages, as opposed to some speculative harm." Shaulis v. Nordstrom, Inc., 865 F.3d 1, 10 (1st Cir. 2017). The allegations must provide an "objective, identifiable harm that goes beyond the deception itself." Id. Eliassen alleges actual harm, to include the cost for the audit and lost business from the contract involving Syamala, that will be discussed in further detail with regard to damages.

### D. Respondeat Superior

Eliassen's respondeat superior claim accuses "Mr. Syamala" of engaging in tortious conduct by intentionally interfering with contractual relationships and engaging in deceptive conduct in which Artificial should be held accountable for. [Dkt. 1 at ¶¶ 58-62]. "In tort, the liability of the principal for the acts of his agent rests upon the ancient doctrine of *respondeat superior,* and the burden is upon the party seeking to prove the agency to establish (1) the relationship of principal and agent, and he must also prove (2) that the servant or agent was acting within the express or implied authority conferred upon him by his appointment, and (3) that at the time of committing the tortious act, he was acting upon or within the employer's business or affairs." Griffiths v.

Town of Hanover, No. 1:11-CV-12115-JLT, 2012 WL 3637791, at *3, fn. 33 (D. Mass. Aug. 21, 2012) (quoting § 17.8. Agency in Tort, 17 Mass. Prac., Prima Facie Case § 17.8 (5th ed.)). Specifically, the focus for respondeat superior liability for an intentional tort committed by an employee is "whether the act was within the course of employment, and in furtherance of the employer's work." Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 311 (D. Mass. 2017) (quoting Howard v. Town of Burlington, 506 N.E.2d 102, 105 (1987)).

Eliassen alleges that Artificial's employee, Syamala intentionally engaged in tortious conduct, because he had no intention of performing his position and therefore planned to have someone else perform his duties. [See Dkt. 1 at ¶¶ 25, 58, 60-62]. While the supporting allegations are scant, they establish at a minimum that Syamala was an employee of Artificial, and that Artificial was aware that Syamala was using an unauthorized replacement to carry out his duties in furtherance of the agreement. This is sufficient to make out a claim under respondeat superior.

### E. Damages

Following the determination that a plaintiff has alleged viable claims to warrant a default judgment, the court looks beyond the pleading in determining appropriate damages to award. "[T]he allegations in the complaint with respect to the amount of damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Innovative Sports Mgmt., Inc. v. Serna, 495 F. Supp. 3d 36, 43 (D. Mass. 2020) (quoting Credit Lyonnais Sec. (USA), Inc., v. Alcantara, 183 F.3d 151, 155 (2nd Cir. 1999)). Fed. R. Civ. P. 55(b)(2) provides that the court "may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D)

investigate any other matter." Louis P. Cote, Inc. v. DSA Encore, LLC, No. 16-CV-10862-ADB, 2016 WL 6496435, at *2 (D. Mass. Oct. 28, 2016) (quoting Fed. R. Civ. P. 55(b)(2)).

The Court held a hearing to allow Eliassen to present evidence in support of its claims for $1,893,496.89. During the hearing, Eliassen called witness, Todd Michael Keebaugh, the vice president and general counsel for Eliassen. Plaintiff also provided copies of correspondence between Eliassen and the Client, a demand letter sent to Artificial, the contract between Eliassen and the Client for Syamala's services, the contract between Eliassen and Artificial (to include the Purchase Order) regarding Syamala's services, the Release Agreement between Eliassen and the Client, and invoices for attorneys' fees. For the following reasons, the Court declines to award the full amount of $1,893,496.89 in damages.

**1. Tortious Interference**

As discussed, there is a plausible interference claim for the existing contract concerning Syamala, however the full extent of related damages claimed are far too speculative. Keebaugh testified that, at the time of the Symala incident, the "work in progress" that Eliassen was engaged in for the Client included filling two "roles." The first step of the process begins when the Client first reaches out to Eliassen with a "requisition," triggering Eliassen's search for qualified candidates to potentially fill the position. Once Eliassen identifies qualified candidates, it is considered to have established a "role," beginning the interview process with the Client. Eliassen has estimated that the two roles at issue were worth $260,000 at the time of the incident. When the Court questioned how the witness arrived at this number, he stated that it was based on the anticipated scope of work which, no document reflecting the scope of work was provided. No other specifics were provided regarding these individuals. No corroborating documents indicating the Client intended to hire these two individuals were provided, or draft contracts,

agreements, anticipated length of employment, or anything else that could indicate that these two roles would manifest into something beyond speculation. The witness, then claimed $240,000 was lost in nine expected requisitions, which is even more speculative than the two roles, considering Eliassen did not have an established history providing candidates for the Client. According to the witness, Syamala was the first role that Eliassen had filled for the Client, and the relationship—although long fought for—was newly established. There is very little history between Eliassen and the Client concerning requisitions to make any predictions of future success, making it nearly impossible to calculate damages for potential acquisitions without severe speculation. Ultimately Eliassen is asking for damages for the delay of future business, which requires the Court to assume that Eliassen would have fulfilled all the acquisitions by the point the Complaint was filed, and to some degree, ignore the Release Agreement between Eliassen and Nomura that clearly states that "Nomura has agreed not to terminate the Agreement between the Parties regarding providing Consulting Services. . . . " [Dkt. 29, Ex. F at 2]. Accordingly, the Court declines to award Eliassen with the amount of $555,191.21 for prospective business. The damages concerning the contractual interference involving Syamala are duplicative of the breach of contract claim—meaning, the two claims share the same wrongful conduct that supports and results in their respective damages. Therefore, the details of those damages are discussed below, under breach of contract.

### 2. Breach of Contract

As to the breach of contract claim, the standard is to allow the plaintiff to recover the amount plaintiff would have received had the contract been performed. Doering Equip. Co. v. John Deere Co.--A Div. of Deere & Co., 815 N.E.2d 234, 238-39 (2004); Sullivan v. O'Connor, 363 Mass. 579, 583, 296 N.E.2d 183, 186 (1973). Artificial breached the February 22

Agreement with Eliassen and failed to comply with the indemnification clause that required it to compensate Eliassen for the damages resulting from the breach. The loss sustained due to the breach includes the funds Eliassen would have acquired from the Client for the Syamala contract, and the $55,191.21 paid by Eliassen for the security audit. The contract between Eliassen and the Client indicated that Syamala would have a start date of April 11, 2022, and a completion date of April 10, 2023 (although that date could be extended if required by the Client). [Dkt. 29 at Ex. A]. The Client was to pay Eliassen a daily rate of $960 per day (10 hours) "actually worked" [id.], with the estimated hours of 2,080 [id. at Ex. C], and a projected net amount of $199,680 paid to Eliassen. [Id.]. Artificial had a supplier's rate of $80 per hour, estimating a total of $166,400 paid by Eliassen. [Id.]. After subtracting Artificial's projected compensation, Eliassen forewent an estimated $33,280 due to the breach. Accordingly, the Court awards a total of $88,471.21 when including the audit costs.

### 3. Chapter 93A

Claims pursuant to Section 11 of 93A may only recover "actual damages" or for the purpose of Chapter 93A, "the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence." M.G.L. ch. 93A, § 11. Duplicative, actual damages, meaning damages that arise from the same conduct as 93A under another claim,[4] are barred. See LaBarre v. Shepard, 84 F.3d 496, 502 (1st Cir. 1996). The bar on duplicative damages should not be construed to mean that a plaintiff forgoes other relief under 93A, such as multiple damages or attorneys' fees not awarded by other statutes or common law claims. See Boyle v. Mirrer, 92 Mass. App. Ct. 1102, 87 N.E.3d 1200 (2017). Additionally, the damages cannot include "speculative harm." Shaulis, 865 F.3d 1 at 10.

---

[4] Costa v. Brait Builders Corp., 972 N.E. 2d 449, 455 (2012).

Courts may provide multiple damages under Section 11 where a defendant's action is deemed knowing or willful, which the Court has determined here.  See Arthur D. Little Int'l, Inc. v. Dooyang Corp., 979 F. Supp. 919, 926 (D. Mass. 1997), aff'd sub nom. Arthur D. Little, Inc, 147 F.3d 47 (1st Cir.1998).  While Eliassen's damages are duplicative, Artificial's willful misconduct makes treble damages appropriate here.  Therefore, the amount of $88,471.21 from the breach of contract is trebled to the amount of $265,413.63.  The attorneys' fees totaling $51,223.98 are separate and are not included in the trebled amount.

Accordingly, the Court awards Eliassen with the trebled amount of $265,413.63, attorneys' fees of $51,223.98, and a prejudgment interest at 12% for an amount of $44,414.97.

## IV. CONCLUSION

For the foregoing reasons, Eliassen's motion for default judgment [Dkt. 18] is **GRANTED**. Total damages are awarded against Artificial and in favor of Plaintiff in the amount of $361,052.58.

**SO ORDERED.**

Dated: March 27, 2024                                          /s/ Angel Kelley
                                                               Hon. Angel Kelley
                                                               United States District Judge